FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★  JUN 20 2016  ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X
                              :

C.D. and T.B., individually and on behalf of H.B.,   :      15-CV-2177 (ARR) (JO)
                              :

              Plaintiffs,               :

     -against-                          :      OPINION & ORDER

NEW YORK CITY DEPARTMENT OF EDUCATION,   :

              Defendant.            :
---------------------------------------------------------------- X

ROSS, United States District Judge:

      Plaintiffs C.D. and T.B. ("parents") bring this action individually and on behalf of their

minor son H.B. ("student") pursuant to the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. § 1415(i)(2). Plaintiffs seek review of a final administrative decision

denying reimbursement of private school tuition for the 2012-2013 school year. Plaintiffs also

assert claims pursuant to Article 89 of the New York State Education Law and Section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. § 794, seeking the same relief.

      Now before the court are cross-motions for summary judgment on the IDEA claim. At

issue is the adequacy of the individualized education program offered by defendant, the New

York City Department of Education ("DOE"), to provide a free appropriate public education to

the student. For the reasons set forth below, this court finds that the DOE denied the student a

free appropriate public education. Accordingly, plaintiffs' motion for summary judgment is

granted and defendant's cross-motion is denied.

## STATUTORY SCHEME

      The IDEA requires states receiving federal funds to provide all children with disabilities

a "free appropriate public education" ("FAPE"). Gagliardo v. Arlington Cent. Sch. Dist., 489

F.3d 105, 107 (2d Cir. 2007) (quoting 20 U.S.C. § 1412(a)(1)(A)); Bd. of Educ. v. Rowley, 458 U.S. 176, 187 (1982)). "To meet these requirements, a school district's program must provide 'special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits.'" Gagliardo, 489 F.3d at 107 (quoting Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (internal quotation marks omitted)). The education and related services must be administered according to an individualized education program ("IEP"). 20 U.S.C. § 1414(d). "The IEP, the result of collaborations between parents, educators, and representatives of the school district, sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." Lillbask ex. rel. Mauclaire v. Conn. Dep't of Educ., 397 F.3d 77, 81 (2d Cir. 2005) (quoting Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., 297 F.3d 195, 197 (2d Cir. 2002) (internal quotation marks and citations omitted)).

New York "has assigned responsibility for developing appropriate IEPs to local Committees on Special Education ('CSE'), the members of which are appointed by school boards or the trustees of school districts." Gagliardo, 489 F.3d at 107 (quoting Walczak, 142 F.3d at 123); see also N.Y. Educ. Law § 4402(1)(b)(1). "In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." Gagliardo, 489 F.3d at 107-08. "[T]he CSE must also be mindful of the IDEA's strong preference for 'mainstreaming,' or educating children with disabilities 'to the maximum extent appropriate alongside their non-disabled peers.'" Id. at 108 (citing 20 U.S.C. § 1412(a)(5)).

If a disabled child's parents believe that an IEP does not offer their child a FAPE, they may unilaterally place their child in a private school and seek retroactive tuition reimbursement from the school district. See 20 U.S.C. § 1412(a)(10)(C)(ii); R.K. ex rel. R.K. v. N.Y. City Dep't of Educ., No. 09-CV-4478, 2011 WL 1131522, at *2 (E.D.N.Y. Mar. 28, 2011). In New York, parents present their request for reimbursement at a due process hearing before an impartial hearing officer ("IHO"), whose decision may be appealed to a state review officer ("SRO"). N.Y Educ. Law § 4404; see 20 U.S.C. § 1415(f)-(g). The SRO's decision may then be reviewed by a state or federal court. 20 U.S.C. § 1415(i)(2)(A); Gagliardo, 489 F.3d at 108.

## FACTUAL BACKGROUND

The following facts were developed in the state administrative proceedings. Neither party has requested that this court hear additional evidence. See 20 U.S.C. § 1415(i)(2)(C)(ii).

### A.    The Student's Educational History

H.B. is now a seventeen-year-old boy who has been classified as having a speech or language impairment. See Neuropsychological Evaluation of Dr. Barbara J. Kenner ("Ex. H") at 3.[1] He has been diagnosed with Asperger's disorder as well as anxiety, learning, and developmental disorders and epilepsy. Id. at 2-3. He is described as sweet, bright, and personable. Id. During the timeframe at issue in this suit, H.B. enjoyed listening to music and learning about history. Id. at 2. He was a talented artist and an able student "making solid progress in all areas of his development." Id. at 2-3.

H.B. was born preterm at 32 weeks. Id. at 2. He subsequently experienced delays in his expressive language and social skills. Id. H.B.'s parents sought early intervention services for

---

[1] Exhibits introduced at the impartial hearing by the parents are labeled with letters, and exhibits introduced at the impartial hearing by the DOE are labeled with numbers. The record received by this court is located at Dkt. #8.

toddlers with disabilities through the New York City Health Department, followed by preschool special education services from the DOE. Impartial Hr'g Tr. ("Tr.") 317-19; Ex. H at 2. H.B. attended several school programs in his early years, including ones at Brooklyn Friends, The Dillon School, P.S. 3, The Downtown Little School, and The Ideal School. Id.

When H.B. entered the sixth grade, the DOE recommended that he attend a public school program. However, there was no space in the program that the parents had identified as appropriate for H.B., so they enrolled him at Aaron Academy ("Aaron") and sought reimbursement from the DOE. Tr. 320-24; Findings of Fact and Decision of IHO Christine Moore dated July 11, 2011 ("Ex. C") at 3-4. An IHO found that the DOE had failed to provide H.B. with an offer of a FAPE, that Aaron was an appropriate placement for H.B., and that the equities weighed in favor of reimbursement. Ex. C at 5-17. The IHO ordered the DOE to reimburse the parents for H.B.'s placement at Aaron for the 2010-2011 school year. Id. at 17. That decision was never appealed, and Aaron therefore became H.B.'s last agreed-upon, or pendency, placement. Tr. 58-60.

**B.     The 2012 Psychological Examinations**

In November 2011, when H.B. was a seventh grader at Aaron, the DOE sought consent from the parents to reevaluate H.B. See Letter from DOE dated Nov. 18, 2011 ("Ex. S") at 4. H.B.'s mother wrote a letter to a DOE school psychologist, Rose Fochetta, granting consent to the reevaluation and explaining that H.B. had been diagnosed with epilepsy. See Letter from C.D. dated Dec. 2, 2011 ("Ex. S") at 3. She explained that H.B.'s neurologist recommended time for H.B. to stabilize on his new seizure medication before subjecting him to any assessments. Id. She further advised that a private psychologist planned to evaluate H.B. once that occurred, and she promised to provide a copy of the evaluation once completed. Id.

That evaluation took place in February 2012. Ex. H at 1. Dr. Kenner undertook a neuropsychological evaluation to determine H.B.'s "current level of cognitive, academic, and emotional functioning and to facilitate educational planning." Id. Dr. Kenner observed that H.B. was "hardworking, respectful, and exceedingly cooperative." Id. at 3. Although he exhibited a positive mood, his "range of affect was somewhat limited" and "his eye contact was variable." Id. Additionally, Dr. Kenner noted "difficulties in pragmatic language and reading of social cues" as well as "weaknesses in attention, response inhibition, processing speed, and working memory." Id. H.B. was easily distracted, overwhelmed, and frustrated. Id. Noting that H.B. "is a bright student who has a healthy self-esteem and a positive attitude toward the learning process," Dr. Kenner found it "critical that he continue to receive intensive support in a highly structured, self-contained, nurturing special education environment for children of average to above average intelligence." Id. at 10. She specifically recommended a high teacher-to-student ratio and a teaching staff with training in working with students like H.B. Id.

The following month, H.B. was also evaluated by Dr. Edward Hoffman, a licensed psychologist contracted by the DOE. See Psycho-Educational Evaluation of Dr. Edward Hoffman ("Ex. 5"); Tr. 117-18. Although the two evaluators utilized different tests, their results were largely consistent. See IEP ("Ex. 1") at 1. Dr. Hoffman described H.B. as "impulsive" and "highly distractible," exhibiting "attentional difficulties" and requiring "constant reminders and encouragement from this examiner to remain on task." Ex. 5 at 1. Dr. Hoffman recommended "teaching strategies involving verbal descriptions and written materials to accompany both pictures and manipulatives" as well as activities drawing upon his strength in grapho-motor tasks. Id. at 6.

C.    The April 2012 Individualized Education Program

On April 19, 2012, the CSE convened to formulate an IEP for H.B. In attendance were the student's parents; Ms. Fochetta, who served as the district representative; Feng Ye, a special education teacher whom Ms. Fochetta characterized as her "partner"; and Gloria Gonzalves, a parent representative Tr. 14-15; Meeting Minutes dated Apr. 19, 2012 ("Ex. 2") at 1. Mathieu Moss, who taught H.B. at Aaron since the 2010-2011 school year, participated telephonically. Id. Ms. Fochetta conducted the meeting with the assistance of Ms. Ye. Tr. 31-32, 336. The former had drafted an IEP prior to the meeting, which she used as "a way to take notes and collect everyone's perspective and to create the final IEP." Id. 11; see also Annotated Draft IEP ("Ex. 3").

At the CSE meeting, the team members reviewed both evaluations discussed above as well as assessments from Aaron and a classroom observation report by Ms. Fochetta. Tr. 10. A copy of Ms. Fochetta's draft IEP was provided to the parents. Id. 11. Team members who later testified at the impartial hearing offered accounts of what transpired at the meeting. Those accounts conflict in certain important respects outlined below.

1.    Ms. Fochetta's account

Ms. Fochetta testified that the meeting lasted approximately 90 minutes, during which attendees "went through the IEP page by page, point by point, and at each point . . . asked for [p]arent input." Id. 19, 120. She recalled that the parents "relay[ed] . . . certain things they wanted in terms of goals [and] their ideas about their son." Id. 19. With respect to goals, Ms. Fochetta recalled that the parents noted concerns regarding H.B.'s pacing and stamina in his coursework as well as his interest level and engagement. Id. 20. According to Ms. Fochetta,

specific goals as well as specific accuracy levels were requested by the parents and incorporated into the IEP. Id. 20, 28, 32-39.

Ms. Fochetta further testified that the parents and the teacher requested a 12:1+1 ratio, rather than the 12:1 ratio she had originally recommended, to ensure sufficient support for H.B. Id. 40-41. The term "12:1+1" (or "12:1:1") refers to the class staffing ratio; in a 12:1+1 class, there are twelve students, one teacher, and one paraprofessional. Id. 135. Ms. Fochetta agreed to that request. Id. 41, 112-13. She also testified that the team members recommended a "special class" in a "community school," meaning a classroom specifically for students with disabilities in a school not limited to students with disabilities. Id. 41-42. According to Ms. Fochetta, "[n]o objections were voiced" to the recommendation of a 12:1+1 special class in a community school. Id. 42-43. She explained that the team believed H.B. would be able to function in a community school environment because he was "largely cognitively and academically intact." Id. 45. Ms. Fochetta did not recall the team members at any time asking her to consider a full-time special education school for H.B. Id. 113-16. She did recall that the parents requested a small school with a staggered hallway experience, but she testified to her understanding that she had no role in choosing the school H.B. would attend and therefore only recorded this request in the "Parent Concerns" section of the IEP. Id. 92-97, 100-02, 136-37.

With respect to H.B.'s recent diagnosis of epilepsy, Ms. Fochetta testified that the parents "were just beginning to figure out the results." Id. 72. She learned during the meeting that H.B. had not suffered any seizures since starting medication and had never suffered a seizure at school. Id. 123. When asked whether the team members "consider[ed] making any recommendations for modifications to the physical environment" in light of H.B.'s epilepsy, she testified that she was unsure what recommendations the team could have made with respect to

managing that condition. Id. 74. She further testified that she had never made recommendations
in an IEP concerning specific environmental conditions such as lighting. Id. 74-75.

      2.   Mr. Moss's account

    Mr. Moss testified that he disagreed with the recommendation of placing H.B. in a
12:1+1 classroom within a community school. Id. 195. According to Mr. Moss, he stated during
the meeting that that ratio would only be appropriate for H.B. in a school setting similar to
Aaron, and not in a community school, given the amount of interaction and commotion
associated with the latter. Id. 195-97. He expressed his view that "a setting similar to Aaron was
appropriate for [H.B.], because he needed small class sizes and a small school." Id. 197. He also
recommended a school populated with students "of similar learning differences to [H.B.] so that
he feels part of a community that appreciates him and that he doesn't stand out or isn't singled
out." Id. Mr. Moss testified that a large school would be overwhelming and isolating for H.B.,
describing these as "big concerns" that he shared at the meeting. Id. 198.

    Upon reviewing the "Parent Concerns" section of the IEP, Mr. Moss testified that he
recalled the parents raising those concerns at the meeting. Id. 211. Mr. Moss testified that the
parents "raised significant concerns about [H.B.'s] seizures, and what needed to be put in place,
to make sure that they didn't occur again, or at least to give it the best chance of not occurring
again." Id. 192. According to Mr. Moss, the parents identified specific environmental conditions
that could precipitate seizures such as temperature increases, flashing lights, dehydration, and
stress and anxiety. Id. 193-94. They also talked about the need for a staggered hallway
experience, a quiet environment free of bells and buzzers, and a calm lunchroom with a small
population of students. Id. 212-14. In response, he testified, the district representatives "said that

they would put [the concerns] in the notes and then moved on" with no "further discussion to figuring out how placements could be appropriate with those [p]arent concerns." Id. 211, 213.

### 3. C.D.'s account

C.D. testified that the meeting lasted approximately 45 minutes and that Ms. Fochetta "did all the talking." Id. 335-36. C.D. testified that, prior to the CSE meeting, she was advised by H.B.'s treatment team that her son required a special education setting—meaning a special education school "that's small, minimal outside sensory impact, and had the number of teachers and support service people that he needed." Id. 341-42; see also Letter from Dr. Jonathan Stern of Jan. 28, 2011 ("Ex. M")[2] at 16 ("I believe that the only way that [H.B.] can both learn and develop social-emotionally is to be part of a small, self-contained classroom in a special education school") (emphasis in original). She related this advice during the CSE meeting. Tr. 342-43; see also Ex. 3 at 9 (recording "small school, small classroom setting" under "Parent Concerns" in the "Promotion Criteria" section of the draft IEP). C.D. believed that Ms. Fochetta agreed that H.B. required placement in a special education school; she did not object to the recommended placement in a community school because she thought that term referred to a special education school "in the community." Id. 363-64. She testified that there was no discussion at the meeting about placing H.B. in a general education setting. Id. at 364.

According to C.D., the student's epilepsy diagnosis was discussed at some length by the team members. C.D. testified that she relayed information provided by the student's neurologist,

---

[2] At the impartial hearing, the DOE objected to the admission of Exhibit M, which contained three separate documents including this letter. The hearing officer determined that Dr. Stern's letter was relevant to this case and "has information that should have been considered by the IEP team." Findings of Fact and Decision of IHO Rona Feinberg dated June 6, 2013 ("IHO Decision") at 24-25. The hearing officer acknowledged that Ms. Fochetta could not recall whether she reviewed the letter. Id. at 25. However, the hearing officer also cited Ms. Fochetta's testimony that she looked at the "most recent" evaluations at the CSE meeting and found that the letter represented the most recent evaluation from H.B.'s psychotherapist. Id.

Dr. Kiznicki, regarding a learning environment that would mitigate his risk of future seizures. Id.

343-44. Specifically, C.D. said that she requested a "small, calm, well lit, climate controlled"

environment where the student would always have access to water and to an adult whom he

could advise if he experienced a precursor to a seizure. Id. at 344. According to C.D., Ms.

Fochetta responded that she would "take that under advice" but cautioned that she had "no

control over where [H.B.] goes." Id. 344, 348. C.D. believed that Ms. Fochetta was documenting

the parent concerns in good faith with hope that they would influence the placement office but

recognition that she could not control the placement outcome. Id. 349.

4.    The resulting individualized education program

The IEP recorded the results of H.B.'s recent evaluations, which it described as "largely

consistent." Ex. 1 at 1. With respect to cognitive functioning, the IEP noted average scores on

verbal and spatial functioning and general cognitive ability, and a low average score on

nonverbal reasoning. Id. With respect to academic functioning, the IEP noted a high average

score on spelling; average scores on letter-word identification, reading fluency, passage

comprehension, quantitative concepts, and calculation; a borderline score on math fluency; and a

low score on writing fluency. Id. The IEP described "his ability to stay focused" as the student's

weakness and recommended "support with his executive functioning skills, specifically planning

and organizational skills." Id. at 2.

On the subject of his social development, the IEP noted H.B.'s impairments in

maintaining eye contact, exhibiting social reciprocity, and interpreting facial expressions. Id. It

stated that H.B.'s "significant difficulties in affect recognition, understanding another person's

perspective and interpreting ambiguity" had a negative impact on his peer relationships and

caused him anxiety. Id. The IEP stated that, although H.B. was well-liked by his classmates, he

10

"display[ed] an[] egocentric approach to engagement" and "struggle[d] to initiate interactions with peers without resorting to inappropriate joking." Id.

Several management needs were enumerated. Id. at 3. They include, inter alia, frequent breaks and redirection, repetition of academic instructions, and use of outlines and checklists. Id. The IEP recommended that H.B. receive preferential seating near the teacher to increase participation and that he be permitted to draw during class time to improve his listening and impulse control. Id. The IEP set several annual goals for H.B. in the areas of math application skills, pragmatic language skills, sensory processing skills, executive functioning skills, and body awareness. Id. 5-7. It also set goals with respect to study skills such as pacing and stamina and with respect to social skills such as impulse control, emotional regulation, and reciprocal social interactions. Id. at 5-6.

According to the IEP, H.B. "should have full access to the general education curriculum with supports." Id. at 3. The placement recommendation was "NYC DOE Community School" with both reading and math at the seventh grade level. Id. 12. With respect to service delivery, it recommended that H.B. take each school subject in a special education classroom with a 12:1+1 student-to-staff ratio.[3] Id. at 8. Recommendations for related services included speech-language therapy in a group setting three times per week for forty minutes; occupational therapy in a group setting one time per week for forty minutes; occupational therapy in an individual setting one time per week for forty minutes; counseling services in a group setting one time per week for forty minutes; and counseling services in an individual setting one time per week for forty minutes. Id. 8-9.

---

[3] Consistent with testimony provided at the impartial hearing, reviewed above, the IEP acknowledged that "[a] special class in a community school with a student to teacher ratio of 12:1 was considered and rejected at the request of both the parents and teacher." Id. 14.

The penultimate section of the IEP contained a section on "Parent Concerns" that states

as follows:

> Parent related the need for a small school and a small classroom setting with staggered hallway experiences. [H.B.] should be with peers who are above average. Bells and buzzers can [s]hut him down, he needs an environment with low sensory distraction. A calm lunchroom environment. His acting out is increased if he is not stimulated. He needs access to 1:1 interactions. Parents related concerns about bullying and noted that he should be in an environment with other students who have differences similar to [H.B.].

Id. 13.

### D.    The Placement at Brooklyn Secondary School

Approximately four months later, by letter dated August 8, 2012, the DOE offered H.B.

placement at Brooklyn Secondary School for Collaborative Studies ("Brooklyn Secondary

School"). See Final Notice of Recommendation: Annual Review and Reevaluation ("Ex. 7") at 1.

The notice advised the parents of their "right to visit the site" and provided Nancy Funke as their

contact for arranging a site visit. Id. The notification also invited the parents to contact Ms.

Funke if they wished to discuss the decision or arrange another meeting. Id. The notification

advised that failure to respond within ten days of the date on the letter would cause the

recommended services to go into effect. Id. The letter stated, "Only if you request another IEP

Meeting, mediation, or impartial hearing, before this date, the recommended changes will not be

put into effect and your child will continue to receive the services s/he is currently receiving until

all appeal procedures have been implemented." Id.

The parents faxed a letter to Ms. Funke dated August 13, 2012, requesting additional

information about the placement. See Letter from C.D. and T.B. dated Aug. 13, 2012 ("Ex. E")

at 2-4. The letter sought specific types of information about Brooklyn Secondary School and

requested an appointment to visit. Id. at 3-5. In the letter, the parents expressed concern "that the

DOE's program and placement will not provide [H.B.] with the kind of learning environment he

needs to continue to progress in terms of his . . . needs." Id. at 3. The parents also revealed that
they had reserved a spot for their son at Aaron for the coming year as a fallback option if the
placement offered by DOE proved unsuitable.[4] Id. at 4. However, the parents emphasized that
they wanted to "explore all options" and would give up their spot at Aaron if the placement offer
proved appropriate. Id. at 3-4. According to C.D., the parents received no response to that letter.
Tr. 384-85.

Three days later, an attorney representing the parents sent a letter to the DOE conveying
the parents' belief that the DOE had failed to offer their son a FAPE for the 2012-2013 school
year. See Letter from Steven L. Goldstein dated Aug. 16, 2012 ("Ex. D") at 1. The letter charged
that DOE committed procedural errors in developing the IEP that denied the parents their right to
meaningfully participate. Id. It further charged substantive failures in the IEP. Id. The letter
explained that, as a result of these deficiencies, the parents would place their son at Aaron for the
coming school year and seek reimbursement from the DOE through a formal request for an
impartial hearing. Id. However, C.D. testified at the hearing that the parents had not yet decided
whether to reject the offered placement and sent this letter merely to "keep [their] options open."
Tr. 390-92. She further testified that she received no response from the DOE to that letter. Id.
365.

The parents continued to seek information about the offered placement. They arranged
two visits, the first in August during summer recess and second in September on the first day of
school. Id. 352, 356, 375. On the first visit, which lasted approximately one hour, they met with

---

[4] The record indicates that C.D. signed the Aaron contract on March 1, 2012. See Aaron Academy Enrollment
Contract and Payment Schedule ("Ex. O") at 4. The contract's original payment schedule was apparently amended
by Aaron's business manager. See Student Aff. of Attendance ("Ex. P") at 1. The amended payment schedule
required the parents to make a deposit in the amount of $8,000 by March 8, 2012; a first payment in the amount of
$13,975 by May 22, 2012; and a second payment in the same amount by August 22, 2012. Id.

the principal. Id. 374. The principal showed them the special education classroom and the

hallway. Id. 375. C.D. testified that they were "really surprised at how huge the school was" as it

combined an elementary school, junior high school, and high school in the same building. Id.

357, 360. They developed concerns about the physical arrangement of the classroom, the access

to drinking water, the size of the student population, and the general education setting. Id. at 360-

62. On the second visit, which lasted less than an hour, C.D. met with the principal again as well

as the special education teacher. Id. 376-77. She observed a class session in the special education

classroom and asked the special education teacher questions. Id. During this visit, C.D. learned

that the teacher had an epileptic student who experienced a seizure in the lunchroom—where the

entire student body of approximately 400 students dines together at the same time. Id. She

described this arrangement as "the deal ender" in deciding against the placement offer. Id. 391.

H.B. completed the 2012-2013 school year at Aaron.

### E.     The Due Process Impartial Hearing and Decision

By due process complaint dated October 26, 2012, the parents requested an impartial

hearing to challenge the proposed IEP and to obtain reimbursement for the tuition at Aaron for

the 2012-2013 school year. See Letter from Steven L. Goldstein dated Oct. 26, 2012 ("Ex. A").

The complaint, set forth in a sixteen-page letter, charged numerous procedural and substantive

deficiencies with respect to the IEP and the placement. Id. On the procedural front, the letter

alleged that the CSE team was not duly constituted and that the DOE denied H.B.'s teacher and

parents the right to meaningfully participate in the review meeting. Id. at 5-6. On the substantive

front, the letter alleged that the DOE failed to develop adequate baselines and consider sufficient

materials prior to drafting the IEP; failed to conduct a functional behavior assessment ("FBA")

or prepare a behavior intervention plan ("BIP"); predetermined the placement recommendation

without parental input; and hampered efforts by the parents to obtain information about the placement. Id. at 7-13. Additionally, the letter alleged that the IEP included insufficient and inappropriate goals; that it did not provide sufficient accommodations; that it lacked transitional support services; and that the goals in the IEP could not be implemented in the recommended program and placement. Id. The letter further claimed that Aaron was an appropriate placement for H.B. and that equitable considerations supported reimbursement. Id. at 13-14.

           1.    The impartial hearing

The hearing officer conducted an impartial hearing on three non-consecutive dates during January, February, and March 2013. IHO Decision at 3. She received testimony from five witnesses. In addition to Ms. Fochetta and Mr. Moss, introduced above, the following individuals testified: Adam Moro, Assistant Principal and Director of Clinical Services at Aaron; Martine Soren, Social Worker at Aaron; and H.B.'s mother. IHO Decision at 1-2. Portions of their testimony are described in detail where relevant below. By way of overview, they testified as follows.

Ms. Fochetta testified on behalf of the DOE regarding the development of the IEP before and during the CSE meeting in April 2012. Tr. 9-144. She also testified regarding how she understood her role as the district representative at that meeting and what she understood she could and could not recommend with respect to the student's placement. Id. 93-100. Additionally, Ms. Fochetta shared her view that for "a cognitively and academically largely intact individual" such as H.B., a special education school "seems quite restrictive." Id. 111.[5]

---

[5] This portion of the impartial hearing transcript identifies the attorney as the person both asking and answering questions. It is clear that the transcript contains an inadvertent error and that the attorney was asking questions answered by Ms. Fochetta.

Mr. Moss, who teaches mathematics at Aaron, testified regarding his interactions with H.B. as his teacher for two and a half years. Id. 156-254. He explained the academic curriculum designed for H.B. at Aaron. Id. 156-162. He detailed steps taken at Aaron to accommodate H.B.'s unique needs as documented on the IEP. Id. 166-89. He also provided his account of what occurred at the CSE meeting, as outlined above.

Mr. Moro testified regarding the program at Aaron, including its strengths-based model for developing a curriculum matched to each student's strengths and interests. Id. 266-67. He explained that students are placed in classes with peers who achieve similar performance levels. Id. 270. He also provided testimony regarding the qualifications of the professionals who work at Aaron and the support services available to students who enroll at Aaron. Id. 273-80.

Ms. Soren, who carries H.B. on her social work caseload, testified about her role as a social worker, an instructor on social skills, and a facilitator of family support groups and parent workshops. Id. 284-86. Ms. Soren testified that she had known H.B. for two years at the time of the impartial hearing and taught him social skills throughout that time. Id. 287. She provided a description of H.B. as of September 2011 and identified his challenges and the steps taken to address them. Id. 289-91. She shared her view that many of those steps had proved effective during the 2011-2012 school year. Id. 291-301, 303-06. She also related why she believed that H.B. required placement in a school for children with special needs, notwithstanding his considerable intellectual abilities. Id. 301-02.

Finally, the student's mother, C.D., provided lengthy testimony regarding her son's medical and scholastic history, his strengths and weaknesses as a student, and his performance at Aaron. Id. 314-93. She also related concerns she shared with her husband, T.B., regarding placement needs of their son. Id. 342-51. She provided her account of the CSE meeting and

explained why she disagreed with placement in a community school and why she did not object

to that placement at the meeting—namely, because she did not understand that the term

"community school" referred to a general education setting. Id. 360-64. She also detailed her

efforts to secure critical information about Brooklyn Secondary School. Id. 352-85.

2.    The impartial hearing officer's decision and order

The IHO issued an order on June 6, 2013 requiring the DOE to reimburse the parents for

the amount of tuition they paid to Aaron for the 2012-2013 school year. Id. at 34. In a lengthy

and detailed opinion, the hearing officer exhaustively reviewed the record and ruled on certain

evidentiary disputes reserved during the hearing. Id. at 3-25. The hearing officer noted that "[t]he

parents raised numerous issues in the impartial hearing request" but "address[ed] only those

necessary to support [its] Decision and Order." Id. at 27. The hearing officer rejected several

challenges mounted by the parents, finding "that the IEP team was duly constituted and that the

IEP was adequate and appropriate." Id. Additionally, the hearing officer determined that "neither

an FBA nor a BIP was required at the time of the IEP meeting." Id. Further, the hearing officer

determined that the IEP reflected concerns raised by the parents and the teacher and that it

contained appropriate goals. Id. at 28.

The hearing officer nonetheless concluded that the DOE deprived H.B. of a FAPE

because the program recommendation and the placement offer were inappropriate. Id. The

hearing officer noted that the team members most familiar with H.B. and his needs were his

parents and teacher. Id. Ms. Fochetta, by contrast, had limited knowledge regarding H.B., having

observed him only once for approximately forty-five minutes in a classroom setting. Id. Despite

this information asymmetry, the hearing officer found, Ms. Fochetta improperly discounted the

views and concerns of H.B.'s parents, teacher, and doctor as mere "perspectives" and privileged

her opinions about H.B.'s cognitive abilities while disregarding realities about his environmental needs. Id. at 28-29. The hearing officer found Ms. Fochetta's "reasoning and perspective to be flawed" when she decided—contrary to numerous opinions that H.B. required a small classroom environment in a special education setting—that the least restrictive environment for H.B. was a general education setting with typically developing peers. Id. at 29. The hearing officer noted the incoherence in Ms. Fochetta's view that H.B. required a general education setting given her recommendation of a 12:1+1 special education classroom—meaning H.B. would interact with typically developing peers only while outside the classroom in the lunchroom or hallways where he had well-documented issues doing so. Id. at 29. Finally, the hearing officer found that the decision to recommend a community school when Ms. Fochetta conceded that she would have no control over the size of such a school "failed to provide [H.B.] with a program designed to meet his unique needs." Id. at 30.

In addition to these deficiencies with the IEP, the hearing officer identified deficiencies with the placement. Specifically, the hearing officer found that "the placement office failed to consider all of the information about the child on the IEP when recommending the Brooklyn Secondary School." Id. Because the hearing officer found that the IEP contained "sufficient information to alert the placement office that the child required a small school setting," the hearing officer concluded that its recommendation of "a school with over 400 students ranging from grades six through twelve" was inappropriate. Id. To that end, the hearing officer noted a large lunchroom with 400 students dining simultaneously, and hallways bustling during transition, as conditions that would pose problems for H.B. Id.

The governing legal standard also required the hearing officer to consider whether the parents had demonstrated that Aaron was an appropriate placement for H.B. and whether equities

18

favored reimbursement. Id. at 30, 33. As to the former, the hearing officer determined that Aaron

was reasonably calculated to enable H.B. to receive educational benefit, was not too restrictive,

and provided him with educational instruction designed to meet his needs. Id. at 31. Relevant to

this determination were the low student-to-teacher ratio, the provision of related services, the

satisfactory academics, the individualized attention to H.B.'s learning needs and areas for

growth, and the effective management of his epilepsy. Id. at 31-32. As to the latter, the hearing

officer concluded that the equities favored the parents in light of evidence that they fully

cooperated with the DOE and made significant efforts to meaningfully assess the placement. Id.

at 33. The hearing officer also found that steps taken by the parents to ensure H.B. would have a

spot at Aaron should DOE fail to offer an appropriate placement did not evince bad faith in their

engagement with the DOE. The hearing officer further concluded that the parents had sent their

notice declining the placement before they had visited as a result of mandatory deadlines, and

that their notice did not excuse the DOE from responding to their requests for information or

prevent the DOE from offering another placement. Id. at 34.

### F.     The Appeal to the State Review Officer and Decision

The DOE appealed the IHO's decision to the Office of State Review of the New York

State Education Department, and the parents cross-appealed. The DOE argued on appeal that the

IHO erred in concluding that the DOE failed to offer H.B. a FAPE and further erred in

determining that the placement was inappropriate based solely upon speculative claims by the

parents. Id. at 3. In their cross-appeal, the parents alleged error in the IHO's findings that the

CSE team was properly composed, that its members meaningfully participated in developing the

IEP, and that the IEP was adequate and appropriate. Id. The parents further argued that the IEP

lacked sufficient transitional support services for H.B. Id. at 3-4. They annexed additional evidence to their cross-appeal, the inclusion of which the DOE challenged. Id. at 4.

In its opinion, the SRO sustained the appeal and annulled the IHO's order awarding tuition reimbursement. See Decision of the SRO dated December 31, 2014 ("SRO Decision") at 9. The nine-page opinion, roughly half of which contains boilerplate language regarding applicable legal standards, agreed with many of the IHO's conclusions:

> The IHO accurately recounted the facts of the case, addressed the majority of issues identified in the parents' due process complaint notice and set forth the proper legal standards. The decision shows that the IHO carefully considered the testimonial and documentary evidence presented by both parties, and further, that she weighed the evidence and properly supported her conclusions. Furthermore, an independent review of the entire hearing record reveals that the impartial hearing was conducted in a manner consistent with the requirements of due process.

Id. at 6 (internal citations omitted). The SRO determined that evidence in the record supported the IHO's findings that the CSE was properly composed and that all of its members participated meaningfully in developing the IEP. Id. The SRO likewise adopted the IHO's determinations that the IEP was satisfactory—including that the recommended goals were appropriate and that neither an FBA nor BIP were required. Id. The SRO wrote, "To the extent that the IHO found the April 2012 IEP to be appropriate and that any procedural errors that occurred during its development did not rise to the level of a denial of FAPE, those conclusions of the IHO are hereby adopted." Id.

The SRO nevertheless sustained the appeal because it determined that "the IHO erred in finding that the size of the assigned school resulted in a denial of FAPE to the student." Id. (internal citation omitted). The SRO's decision focused on the parents' challenges to the placement. Id. at 7-9. It rejected their argument that Brooklyn Secondary School could not implement the IEP as mere speculation since the student never attended. Id. at 8. First, it found that "a retrospective analysis of how the district would have executed the student's April 2012

IEP at the assigned public school site is not an appropriate inquiry under the circumstances of this case." Id. Further to this point, it determined that the hearing record demonstrated that H.B. would have enjoyed "a small, structured environment, with the student to staff ratio requested by the parents" had he accepted the placement. Id. Second, it found that "it would be inequitable to allow the parent to acquire and rely on information that post-dates the relevant CSE meeting and IEP and then use such information against a district in an impartial hearing while at the same time confining a school district to describing a snapshot of the special education services set forth in an IEP." Id. The SRO excluded the additional information the parents annexed to the cross-appeal about enrollment figures at Brooklyn Secondary School in light of its finding that arguments regarding the placement were too speculative. Id. at 6-7.

The SRO also found that the IHO failed to address claims advanced by the parents about transition goals and support services. Id. at 6. Considering those claims in the first instance, the SRO found that transition-related services were not required for H.B. According to the SRO, the IEP "described the student's difficulty with changing activities and included annual goals to address the student's needs relative to transitioning." Id. at 7 (internal citations omitted). The SRO deemed that information sufficient, particularly in light of the fact that the IDEA does not require a transition plan as part of a student's IEP. Id.

This action followed.

## APPLICABLE LEGAL STANDARDS

### A.     Legal Framework

"The Supreme Court has established the three-pronged Burlington/Carter Test to determine eligibility for reimbursement." C.F. ex rel. R.F. v. New York City Dep't of Educ., 746 F.3d 68, 73 (2d Cir. 2014) (citing Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 363 (2d

Cir. 2006)). This test, articulated in <u>Florence County School District Four v. Carter by and through Carter</u>, 510 U.S. 7, 12-13 (1993), and <u>School Community of Burlington v. Department of Education</u>, 471 U.S. 359, 367 (1985), "looks to (1) whether the school district's proposed plan will provide the child with a free appropriate public education; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities." <u>C.F. ex rel. R.F.</u>, 746 F.3d at 73 (citing <u>Frank G.</u>, 459 F.3d at 363).

**B.      Standard of Review**

On a motion for summary judgment in an IDEA case, the court's inquiry is not limited to the existence of genuine issues of material fact. <u>See Lillbask</u>, 397 F.3d at 83 n.3; <u>Wall v. Mattituck-Cutchogue Sch. Dist.</u>, 945 F. Supp. 501, 508 n.6 (E.D.N.Y. 1996). Rather, the court must independently review the administrative record, along with any additional evidence presented by the parties, and determine by a preponderance of the evidence whether the IDEA's provisions have been met. 20 U.S.C. § 1415(i)(2)(C); <u>Grim v. Rhinebeck Cent. Sch. Dist.</u>, 346 F.3d 377, 380 (2d Cir. 2003). In conducting this review, the court may reject administrative factual findings that are unsupported or controverted by the record. <u>C.B. v. New York City Dep't of Educ.</u>, No. 02-CV-4620, 2005 WL 1388964, at *13 (E.D.N.Y. June 10, 2005).

The court's review is nonetheless "circumscribed." <u>Gagliardo</u>, 489 F.3d at 112 (quoting <u>Muller v. Comm. on Special Educ.</u>, 145 F.3d 95, 101 (2d Cir. 1998)). "While the district court must base its decision on the preponderance of the evidence, it must give 'due weight' to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." <u>A.C. ex rel. M.C. v. Bd. of Educ.</u>, 553 F.3d 165, 171 (2d Cir. 2009) (internal quotation marks, alterations, and citations omitted); <u>see also Rowley</u>, 458 U.S. at 206 (observing that courts may

not "substitute their own notions of sound educational policy for those of the school authorities which they review"). Therefore, a district court should not disturb the SRO's decision if it is "reasoned and supported by the record." Gagliardo, 489 F.3d at 114; see also Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 191 (2d Cir. 2005) (emphasizing that the IDEA demands "substantial deference to state administrative bodies on matters of educational policy"). Deference is due to the SRO's decision, as the final decision of the state, even when it differs from the earlier decision of the IHO. A.C. ex rel. M.C., 553 F.3d at 171.

The Second Circuit has clearly explained the proper standard of review where the decisions of the IHO and the SRO conflict:

> [R]eviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence; courts must defer to the reasoned conclusions of the SRO as the final state administrative determination. However, when . . . the district court appropriately concludes that the SRO's determinations are insufficiently reasoned to merit that deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges, rather than to rely exclusively on its own less informed educational judgment.

M.H. v. New York City Dep't of Educ., 685 F.3d 217, 246 (2d Cir. 2012).

## DISCUSSION

With this standard of review in mind, this court considers the arguments advanced by the parents in their motion. At the first step of the Burlington-Carter Test, they now raise four arguments. One is procedural and three are substantive. Their procedural challenge is that the parents were denied meaningful participation with respect to the IEP and the placement. Their substantive challenges are that the IEP deemphasized critical issues regarding the student's health, that the IEP recommended placement in a community school, and that the DOE offered a placement ill-matched to the student's needs and incapable of implementing the IEP. At the

23

second step of the Burlington-Carter Test, the parents argue that their private placement at Aaron

for the 2012-2013 school year was appropriate. At the third and final step, they contend that the

equities favor them, warranting full reimbursement. This court considers these arguments in turn.

## A.   Procedural Challenge

Not every procedural error in the development of an IEP renders that IEP inadequate.

Grim, 346 F.3d at 381-82. "Only procedural inadequacies that cause substantive harm to the

child or his parents—meaning that they individually or cumulatively result in the loss of

educational opportunity or seriously infringe on a parent's participation in the creation or

formulation of the IEP—constitute a denial of a FAPE." Matrejek v. Brewster Cent. Sch. Dist.,

471 F. Supp. 2d 415, 419 (S.D.N.Y. 2007), aff'd, 293 F. App'x 20 (2d Cir. 2008). The IDEA

instructs that a procedural violation rises to the level of denying a FAPE when the violation

(a) impedes the student's right to a FAPE, (b) significantly impedes the parents' opportunity to

participate in the decision-making process regarding the provision of a FAPE, or (c) causes a

deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii); see also M.H., 685 F.3d at

245.

The parents argue that they were denied meaningful participation with respect to the IEP

and the placement. Pls.' Mem. of Law in Supp. of Their Mot. for Summ. J. ("Pls.' Br."), Dkt.

#20, at 29-32. They provide two reasons why they were denied meaningful participation. First,

they argue that Ms. Fochetta behaved disingenuously in the CSE meeting by claiming to take

certain parental concerns seriously while documenting them in a way that signaled to the

placement officer she did not. Id. at 30. Second, they argue that the DOE hampered their ability

to assess the placement offer by providing late notice of that placement and failing to respond to

inquiries about it. Id. at 31.

Neither the IHO nor the SRO found that the parents were denied meaningful participation. In its decision, the IHO stated that "[t]he IEP includes the parents' concerns about the child and the management needs section of the IEP reflects those concerns as well as the concerns expressed by Mr. Moss." IHO Decision at 28. The SRO likewise found that "evidence in the hearing record" supported a finding that "all of the CSE members were able to participate in the development of the student's IEP." SRO Decision at 6.

This court sees no reason to disturb the finding of both the IHO and SRO that the parents were able to meaningfully participate in developing the IEP. The parents seem to argue that they were denied meaningful participation because they now know, based on Ms. Fochetta's testimony at the impartial hearing, that she privately disagreed with certain concerns voiced by the parents even though she included them in the IEP. Pls.' Br. at 29-30. They seem to further argue that Ms. Fochetta somehow coordinated with the placement officer by recording certain concerns voiced by the parents in the "Parent Concerns" portion of the IEP, thereby signaling that Ms. Fochetta disagreed with the concerns and invited the placement officer to disregard them. Id. at 30. These contentions lack legal and factual support. Even if the hearing record supported them, the parents have offered nothing to demonstrate that such actions on the part of Ms. Fochetta constitute a significant impediment to their meaningful participation. They are more properly construed as substantive challenges to the IEP, which this court addresses below.

The second claim—that the DOE hampered the ability of the parents to assess the placement by providing late notice of that placement and failing to respond to inquiries about it—presents a closer question. As the parents point out, several district courts within this circuit have determined that the right to meaningful participation extends to the placement phase, entitling parents "to obtain relevant information in a timely fashion about the DOE's proposed

25

placement of their child, so as to enable them to assess and comment on that placement." FB v. New York City Dep't of Educ., 132 F. Supp. 3d 522, 538 (S.D.N.Y. 2015) (collecting cases). See also C.U. v. New York City Dep't of Educ., 23 F. Supp. 3d 210, 227 (S.D.N.Y. 2014) ("[P]arents have a procedural right to evaluate the school assignment, i.e., the right to acquire relevant and timely information as to the proposed school.").

This argument was squarely raised in the due process complaint filed by the parents. See Ex. A at 11-12. However, neither the IHO nor the SRO addressed it. The IHO Decision contains no findings regarding this meaningful participation claim, and the SRO decision addresses meaningful participation only in the context of the development of the student's IEP. SRO Decision at 6. When a claim was raised in the impartial hearing, but unaddressed by the administrative hearing officers, the proper course for the federal district court is to remand to the SRO rather than reach the merits. See generally D.N. v. New York City Dep't of Educ., 905 F. Supp. 2d 582, 589 (S.D.N.Y. 2012) ("Under this circumstance, rather than reaching the merits of the unreviewed claims, we remand this matter to the SRO, who is 'uniquely well suited to review the content and implementation' of the Student's IEP.'") (quoting Polera v. Bd. of Educ., 288 F.3d 478, 487 (2d Cir. 2002)). However, because this court finds an independent basis for concluding that the student was denied a FAPE, remand on this claim is unnecessary.

**B.     Substantive Challenges**

A school district complies with the substantive provisions of the IDEA when it provides a disabled child with an IEP that is "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 207. A school district is not, however, required to furnish "every special service necessary to maximize each handicapped child's potential," id. at 199, or to provide "everything that might be thought desirable by loving parents," Walczak, 142

F.3d at 132 (internal quotation marks and citations omitted). "Rather, a school district fulfills its

substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress,

not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial

advancement.'" Cerra, 427 F.3d at 195 (quoting Walczak, 142 F.3d at 130). Therefore, "a court

may not second-guess state educators' policy decisions in the effort to maximize a handicapped

child's educational potential." Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1121 (2d Cir.

1997); see also Rowley, 458 U.S. at 208 ("[O]nce a court determines that the requirements of the

Act have been met, questions of methodology are for resolution by the States."). In order to

avoid "impermissible meddling in state educational methodology," a federal court reviewing the

adequacy of an IEP "must examine the record for any objective evidence indicating whether the

child is likely to make progress or regress under the proposed plan." Walczak, 142 F.3d at 130

(internal quotation marks and citations omitted).

    1.    The adequacy of the individualized education program

    The parents first argue that the IEP was inappropriate because it relegated to the "Parental

Concerns" section various issues regarding the student's need for a small, quiet, controlled

setting. Pls.' Br. at 27-29. The parents argue that including such issues there "was never intended

to reflect a CSE recommendation, but was only a way of appeasing the [p]arents, to create the

illusion that their concerns were being taken seriously when, in fact, they were being dismissed."

Id. at 28. According to the parents, the IHO erred in finding substantive adequacy in the IEP

based in part on the inclusion of these issues in that section since it was tantamount to

disregarding them. Id. Furthermore, the parents argue that the IEP lacked critical

recommendations regarding how to minimize the student's risk of experiencing a seizure at

school. Id. at 29. The parents contend that "the absence of this critical medical information from the IEP could have led to serious harm or even death." Id.

Neither the SRO nor the IHO found that H.B. was denied a FAPE on this basis. Deference is properly accorded to those findings as they are neither unsupported nor controverted by the record. In its detailed account of the evidence presented at hearing, the IHO Decision noted that the CSE team discussed the child's epilepsy, including his grand mal seizures, his adjustment to anti-seizure medication, and his development of tic-like behaviors. IHO Decision at 9. In reviewing this testimony, the IHO Decision emphasized that the child had suffered no seizures since starting medication and that it was unclear whether the medication had entirely eliminated his seizures. Id. The IHO Decision also cited Ms. Fochetta's testimony that "[t]he parents did not indicate what triggered the child's seizures"[6] during the CSE meeting and that she was unsure what recommendations she might include in an IEP to address the child's epilepsy. Id. Her uncertainty is understandable given that neither of the evaluations considered as part of the IEP provided recommendations on managing the child's epilepsy, even though both acknowledged the diagnosis. See Ex. 5 at 1; Ex. H at 2.[7],[8]

---

[6] Although the IHO Decision indicates that the IHO generally credited the testimony of witnesses who appeared at the hearing, id. at 27, the IHO apparently did not fully credit testimony from C.D. and Mr. Moss that this matter was discussed in detail at the CSE meeting. Both testified that C.D. relayed information from the student's healthcare providers about "a setting that recognizes his epileptic risk." Tr. 344 (testimony of C.D.); id. 192, 211-13 (testimony of Mr. Moss). Both further testified that Ms. Fochetta responded by noting her lack of control over the specific placement. Id. "The Court reviews the IHO's determinations of credibility with deference." B.O. v. Cold Spring Harbor Cent. Sch. Dist., 807 F. Supp. 2d 130, 142 (E.D.N.Y. 2011). This court cannot find that the IHO's credibility assessment is arbitrary or capricious, particularly given that the contemporaneous notes of both Ms. Fochetta and Ms. Ye record a discussion regarding epilepsy in substantial detail but lack any reference to what triggered the student's epilepsy, and how those triggers could be avoided. See P.C. v. Oceanside Union Free Sch. Dist., 818 F. Supp. 2d 516, 525 (E.D.N.Y. 2011) ("[A]lthough a hearing officer's credibility determinations may be set aside when they are arbitrary and capricious, 'normally, a finder of fact's determination of credibility receives deference on appeal, because access to live testimony is important to the credibility finding.'") (quoting K.S. ex rel. P.S. v. Fremont Unified Sch. Dist., 545 F. Supp. 2d 995, 1003 (N.D. Cal. 2008) (citations omitted)).

[7] The absence of such recommendations from Dr. Kenner's report is particularly striking, given that the parents informed DOE that they were obtaining her assessment in light of the student's epilepsy diagnosis specifically "to see whether anything could be done to support [the student] during the school day." Ex. S at 3.

[8] This court notes that the record includes references to a letter that the parents provided at the CSE meeting. It is

The lack of reliable information in the record concerning what triggered seizures, and how those triggers could be avoided, distinguishes this case from <u>GB v. New York City Department of Education</u>, No. 14-CV-9951, 2015 WL 7351582, at *15 (S.D.N.Y. Nov. 5, 2015). In <u>GB</u>, the district court rejected a portion of the SRO's decision concerning the student's medical needs as "manifestly erroneous." <u>Id.</u> That court found that the decision improperly described several of the student's serious medical issues "as though they were in the past" and that the IEP ignored recommendations by treatment providers and lacked information about triggers for his conditions. <u>Id.</u> The holding in <u>GB</u> is unsurprising in light of the documentation in the record regarding what triggered the student's seizures, and how those triggers could be avoided:

> [T]he Parents provided the CSE with considerable documentation about his health issues. The Parents gave the DOE a letter from AB's neurologist discussing his seizures and the need to ride to school in a climate controlled bus and with his ride lasting no more than 30 minutes; a letter from his developmental pediatrician discussing his autism, seizure disorder and PANDAS; and a request for medical accommodations completed by his developmental pediatrician, which notes that AB must not be exposed to extreme temperatures and requires constant adult supervision.

<u>Id.</u> at *16.

Such documentation is entirely lacking here. The record belies any claim that the CSE members willfully ignored information available to them about the student's epilepsy, instead indicating that his condition, and related environmental needs, were not well understood at the time the CSE convened to formulate the IEP. Under these circumstances, this court cannot find

---

described as a letter from NYU Langone Medical Center. <u>See</u> Tr. 126-27. Ms. Fochetta believed it provided the most recent information the CSE team had from a psychotherapist, <u>id.</u>, whereas the student's father described it as a letter from the student's epilepsy doctor, <u>id.</u> 255. This letter is apparently missing from the record. Although plaintiffs' counsel indicated that he would send a copy of it to the IHO, this court has not been able to locate the letter in the record provided to the SRO and to this court. This document is therefore beyond this court's proper scope of review and, in any event, the parents do not argue that it contained specific recommendations that the CSE team should have considered in developing the IEP.

that the IHO and SRO erred in finding the IEP adequate and appropriate notwithstanding its lack of recommendations regarding how to minimize the student's risk of experiencing a seizure at school.

> ### 2. The appropriateness of the community school recommendation

The parents next argue that the recommendation for placement in a community school was inappropriate. The parents point to the IHO's finding that, in light of indications that the student required a small school setting, the decision to place him in a community school whose size the CSE team could not control failed to provide him with a program designed to meet his unique needs. Pls.' Br. at 32. According to the parents, it is paradoxical for the DOE to claim that a community school is an appropriate placement for a student who requires a small school setting while acknowledging that it cannot control the size of the school setting in a community school. Id.

As this court explained above, the IHO Decision sharply criticized the IEP's recommendation of a community school. IHO Decision at 30. That decision reviewed evidence available to the CSE team regarding the student's need for a small classroom in a special education setting. It then chastised Ms. Fochetta for dismissing that evidence as mere "perspective," instead promoting her own view that a special education setting would be too restrictive for the student. Id. at 28-29. The IHO concluded that Ms. Fochetta advanced her view at the expense of more reliable and compelling evidence urging a special education setting. Id. at 29. The IHO Decision found the recommendation of a community school particularly offensive for two reasons. First, although Ms. Fochetta emphasized the importance of providing the student with opportunities to interact with typically developing peers, the placement recommendation would enable him to do so only during hallways transitions and lunchtime, occasions that posed

serious challenges to the student even at Aaron, a much smaller school. Id. at 29-30. Second, although Ms. Fochetta apparently agreed that a small school was appropriate for the student, she recommended a community school knowing full well that her recommendation could result in placement within a large school. Id. at 30.

The SRO failed to address this determination. In its decision, the SRO elides the distinction between two separate grounds identified by the IHO in concluding that the student was denied a FAPE. One challenges the recommendation of a community school, whereas the other challenges the placement at Brooklyn Secondary School. Id. at 30. These challenges are related, but they are not the same. The former is a challenge to the recommendation made to the placement officer, whereas the latter is a challenge to the resulting decision of the placement officer—and specifically its capacity to adequately implement the IEP. The SRO lumped these challenges together, see SRO Decision at 6 ("The parents' claims relative to the implementation of the April 2012 IEP, which included the recommended 12:1+1 special class, and assigned public school sight are speculative in nature . . . ."), and dismissed both as speculative.

The SRO did not confront the IHO's findings regarding why recommending placement in a community school denied the student a FAPE by failing to guarantee placement in a small school setting, nor did the SRO make factual findings of its own in reaching its conclusion. It simply stated, citing solely to the IEP, that the "record reflects that had the student attended the district placement, the April 2012 IEP provided for a small, structured environment, with the student to staff ratio requested by the parents." SRO Decision at 8. When the SRO refers to a small "environment," it apparently refers to a small classroom since it is undisputed that, although the IEP recommended a 12:1+1 ratio for H.B.'s academic classes, it made no recommendation with respect to the size of the school. Yet the distinction between classroom

31

size and school size is important since the latter would almost certainly affect the number of students with whom H.B. would interact during hallway transitions and lunchtime, where his social challenges most prominently played out.

The SRO's conclusion is ipse dixit, and it does not deserve this court's deference. "[A] court can only defer where findings have been made; where there are no administrative findings on an issue germane to the court's determination, deference would be inappropriate." Gagliardo v. Arlington Cent. Sch. Dist., 418 F. Supp. 2d 559, 562 (S.D.N.Y. 2006), rev'd on other grounds, 489 F.3d 105 (2d Cir. 2007). The SRO did not make any findings that address or rebut the IHO's findings on this point. Even assuming that a general education setting was appropriate for the student—a proposition flatly contradicted by virtually all evidence in the record other than Ms. Fochetta's unsubstantiated and discredited opinion—the crux of the IHO's decision is that a community school recommendation was still inappropriate since it rolled the dice on school size. Ms. Fochetta acknowledged that a community school might be big or might be small—that there was "huge variation school to school" but that even a small school would likely have approximately one hundred students. Tr. 91-92. She testified that a community school might have chaotic hallway transitions or it might have smooth ones. Id. 101. Yet she insisted throughout her testimony that she was powerless to qualify the recommendation of a community school with parameters for school size or school environment.

Her testimony raises the question of why the CSE would recommend a community school if it could not control for those variables. Ms. Fochetta apparently believed that guaranteeing placement in a school with typically developing peers was more important than guaranteeing placement in a small school. This is the only conceivable reason why she would risk placement in a large and chaotic school—an outcome plainly contrary to the needs of the

32

student, as conveyed by his parents and healthcare providers. Yet the IHO found that Ms.

Fochetta's priorities were flawed because the record evidence demonstrated that school size was,

in fact, more critical to the student than socialization:

> [T]he recommended 12:1:1 program would not have placed the child with general education students for academics. The only time the child would have interacted with general education students would have been outside of the classroom, most notably in the lunchroom. None of the participants at the IEP meeting who knew the child even suggested that the child would be able to socialize with typically developing peers in a community school setting. In fact, the child's mother and Mr. Moss testified that he [sic] child has difficulty with his impulsivity, behavior and anxiety in the lunchroom even at Aaron, which has 40 students compared to the 400 that he would be with for lunch at the Brooklyn Secondary School. Moreover, Ms. Soren testified at the impartial hearing that the lunchroom situation at Aaron is difficult for the child if the atmosphere gets loud and she noted that he requires teacher prompts throughout the lunch period in order to keep his conversations appropriate. It is clear from the testimony at the impartial hearing that student's serious socialization issues, impulsivity and anxiety would be exacerbated in a large lunchroom with 400 students. The hallway transitions in such a large school would pose a similar problem for the child.

IHO Decision at 29-30.

In summary, the IHO found that Ms. Fochetta should not have subordinated legitimate

concerns about school size to her questionable view that the student would have benefitted from

interaction with typically developing peers. Id. This court accords deference to the superior

reasoning and support contained in the IHO Decision, M.H., 685 F.3d at 246, and concludes that

the IEP's recommendation of placement in a community school denied the student a FAPE. As

the IHO found, the record unmistakably shows that a community school recommendation was

not conducive to the student's progress because it hazarded placement in a school environment

that could exacerbate many of the challenges his IEP was designed to manage.

This court is not persuaded by the DOE's arguments to the contrary. The DOE argues

that, in light of the requirement to place students in the least restrictive environment in which

they can be expected to make meaningful progress, the community school placement was

appropriate here. See Def.'s Mem. of Law in Supp. of Cross-Mot. for Summ. J. and in Opp'n to Pls.' Mot. for Summ. J. ("Def.'s Br."), Dkt. #22, at 14-19. However, even assuming that is true, the DOE does not explain why it was more important to place H.B. in a community school than to place him in a small school. The DOE claims that the size of the school was immaterial given evidence that H.B. struggled with socialization even at Aaron where the student population was small. Id. at 17. This claim is unavailing. There is no evidence to support the assumption that multiplying the number of students would not have compounded H.B.'s struggles and detracted more significantly from his learning experience. Similarly unavailing is the DOE's claim that the parents are barred from challenging the community school recommendation because they did not voice objections to it at the CSE meeting. The IHO credited C.D.'s testimony that she was unfamiliar with the term "community school," understood that it meant a special education school in the community, and recalled no discussion at the CSE meeting regarding a general education placement. IHO Decision at 17 (citing Tr. 360-64). Her misunderstanding is unsurprising given the predominant opinion among those most familiar with her son that he belonged in a special education setting. Id. at 29-30.

        3.     The ability of the offered placement to implement the IEP

Finally, the parents argue that the proposed placement at Brooklyn Secondary School was inappropriate. Pls.' Br. at 33-39. The parents cite the SRO's conclusion that concerns about the proposed placement were speculative, a conclusion that the parents argue contravenes the law of this circuit. Id. at 33. According to the parents, the placement was facially deficient because its "overwhelming sensory environment" would not only cause H.B. distress and distraction but would also pose a risk of triggering seizures. Id. at 36-38. Additionally, the parents contend that

Brooklyn Secondary School "was incapable of implementing the related services of speech language and counseling that were mandated on H.B.'s IEP." Id. at 38.

Neither party disputes that the SRO erred when it rejected these arguments out of hand as speculative. Pls.' Br. at 33-35; Def.'s Br. at 24. The SRO found that these arguments were speculative because "the student never attended the recommended placement." SRO Decision at 8. That finding, however, contravenes well-established law of this circuit that "requir[ing] parents to send their child to a facially deficient placement school prior to challenging that school's capacity to implement their child's IEP . . . is 'antithetical to the IDEA'[s] reimbursement process.'" M.O. v. New York City Dep't of Educ., 793 F.3d 236, 244-45 (2d Cir. 2015) (quoting V.S. ex rel. D.S. v. N.Y.C. Dep't of Educ., 25 F. Supp. 3d 295, 300 (E.D.N.Y. 2014)). That case law explains that challenges to implementation are speculative only when they "conclude that a school with the capacity to implement a given student's IEP will simply fail to adhere to that plan's mandates." Id. at 244. By contrast, "it is not speculative to find that an IEP cannot be implemented at a proposed school that lacks the services required by the IEP." Id.

Because the SRO categorically rejected these implementation arguments, it did not engage with their merits, and it declined to accept evidence annexed to the cross-appeal relevant thereto. SRO Decision at 6-9. Under these circumstances, this court would normally evaluate whether it is more appropriate to defer to the IHO's findings on this point or to remand for a decision on the merits by the SRO. See generally New York City Dep't of Educ. v. V.S., No. 10-CV-05120, 2011 WL 3273922, at *10 (E.D.N.Y. July 29, 2011) (discussing circumstances under which one approach is preferred to the other). However, this court need not reach that question because it has already determined that the student was denied a FAPE based on the recommendation of a community school.

**C.     The Appropriateness of the Unilateral Placement at Aaron**

"Once it is determined that the program offered by an IEP will not enable the child to receive educational benefits, the burden shifts to the parents to demonstrate that the school in which they have chosen to enroll their child is appropriate." M.H., 685 F.3d at 252 (internal citations and quotation marks omitted). Appropriateness hinges on whether the placement is reasonably calculated to enable the child to receive educational benefits. See Gagliardo, 489 F.3d at 112. "[P]arents need not show that a private placement furnishes every special service necessary to maximize their child's potential." Frank G., 459 F.3d at 365 (citation omitted). Instead, their burden is to demonstrate that the unilateral placement will furnish "educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction." Id. (quoting Rowley, 458 U.S. at 188-89).

Although the IHO found that the parents met their burden, IHO Decision at 31, the SRO did not address this second factor of the Burlington/Carter Test, SRO Decision at 9, nor did the defendant brief it. "Because the SRO made no specific findings with respect to the appropriateness of the [unilateral placement], the Court must defer to the findings and conclusions of the IHO insofar as they are well reasoned and supported by the record." M.H. v. New York City Dep't of Educ., 712 F. Supp. 2d 125, 163 (S.D.N.Y. 2010), aff'd, 685 F.3d 217 (2d Cir. 2012) (internal citations and quotation marks omitted).

The IHO Decision devotes multiple pages to this factor, drawing upon the testimony of Mr. Moss and Ms. Soren regarding the student's experience at Aaron. It finds several aspects of that environment relevant to its determination that the unilateral placement at Aaron was appropriate: the fulfillment of the child's academic needs; the small class sizes featuring fewer

36

than ten students and at least two staff members; the integration of technology in the classroom; the use of tailored teaching techniques; the provision of speech and language pathologist services in several of the child's classes and his study hall; the individual counseling for at least 45 minutes per week; the attention to the student's social issues and pragmatic language challenges; the morning program and "advisory" meetings to assist with the student's organization at the start of the day; and the end-of-day study hall to address the student's executive functioning and organization issues. IHO Decision at 31-32. Additional services customized to the student included devices to effectively manage his impulsivity and anxiety such as behavior charts. Id. at 32. The decision also cited testimony about awareness and effective management of the child's epilepsy. Id. It credited testimony from Mr. Moss and Ms. Soren that they have witnessed improvement in the student's critical growth areas, including social skills and pragmatic language skills. Id.

These findings are entitled to deference because they are well-reasoned and well-supported by record evidence. The impartial hearing transcript contains extensive testimony by Aaron's Assistant Principal and Director of Clinical Services as well as a social worker and a teacher from that institution. All provided testimony, corroborated by the student's mother, regarding the tailored approach taken by Aaron's staff to meeting the student's unique needs. The IEP identified the student's individual academic needs as direct instruction with chunking and modeling as well as support for his executive functioning skills, particularly planning and organization. See Ex. 1 at 2. The record demonstrates that Aaron met these needs by, inter alia, step-by-step instructions and scaffolding as well as daily meetings in a morning program and "advisory" where H.B. received assistance with organizational skills. Tr. 169, 182-85. The IEP

also included fifteen management needs, and the hearing testimony demonstrated Aaron's capacity to satisfy them and success in doing so. Ex. 1 at 3; Tr. 166-89, 291-301, 303-06.

The DOE has offered no reason to reverse the IHO's determination on this point, and this court finds no reason to do so. Accordingly, this court defers to the IHO's determination and concludes that Aaron was an appropriate placement for H.B.

### D.    Equitable Considerations

"Finally, both administrative review officers and courts are required to evaluate the equities in considering a tuition reimbursement claim." M.H., 685 F.3d at 254 (citing Carter ex rel. Carter, 510 U.S. at 12). A variety of factors inform the analysis at this third and final step of the Burlington/Carter Test,

> including whether the parents cooperated with the CSE (e.g., providing reports, attending the meeting, participating in the meeting); whether the parents timely notified the school district of their intent to place their child in a private school; whether the parents visited the DOE's proposed placement; whether the parents intended to genuinely consider a proposed public placement, or whether they would have kept their child in private school regardless of the proposed public placement; whether the parents or the DOE unreasonably delayed; and the appropriateness of the DOE's conduct . . . .

FB, 132 F. Supp. 3d at 556 (internal citations and parentheticals omitted).

As with the second factor of the Burlington/Carter Test, the SRO did not reach this question. SRO Decision at 9. The IHO did reach it and held that the equities supported the parents. IHO Decision at 33. In its discussion of this factor, the IHO stated that it found no evidence in the record indicating a failure by the parents to cooperate with DOE; to the contrary, the IHO determined based on record evidence that the parents actively engaged with this process by, inter alia, agreeing to the evaluation of their child by Dr. Hoffman, furnishing the evaluation conducted by Dr. Kenner, making efforts to obtain information about the placement, and visiting the Brooklyn Secondary School twice. Id.

In reaching this conclusion, the IHO rejected arguments that the conduct of the parents evinced bad faith. The IHO considered their actions in signing a contract with Aaron and making tuition payments to Aaron for the 2012-2013 school year. The IHO found that "the parents were entitled to ensure that the child had a place to attend school on the first day in the event that the placement proposed by the [DOE] was inappropriate." Id. (citation omitted). Further, the IHO noted that the parents could have received a substantial refund of the payments made to Aaron had they decided to relinquish the student's place there. Id. The IHO also refused to fault the parents for sending their notice rejecting the placement offer before they visited Brooklyn Secondary School. As the IHO pointed out, the parents were legally required to submit their ten-day notice of intent to place their child independently. Id. at 34 (citing 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb) (permitting reduction or denial of reimbursement where "10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice"); see also Ex. 7. Additionally, the IHO found that prompt and persistent efforts by the parents to obtain information regarding the placement met inaction and delay. IHO Decision at 34. In this context, the IHO said, rejecting the placement prior to visiting was reasonable.

The IHO's conclusion that the equities favor the parents is well-founded. Whereas the parents exhibited cooperation and engagement throughout this process, the conduct of defendant can be characterized as dilatory and unresponsive. C.D. offered compelling testimony at the impartial hearing, credited by the IHO, that she would have "[w]ithout question" placed her son in a DOE school if the appropriate one was offered. Tr. 316, 369 ("This is extremely difficult for me, and if you'll allow me to say it, it's kind of traumatizing to have to keep experiencing and retelling my child's disabilities and continued disabilities."). C.D. explained that she signed a

contract with Aaron in March "[o]n the outside possibility as evidenced in the past that . . . the assigned school was not going to work." Id. 367-68. Her actions were appropriate, see A.R. ex rel. F.P. v. New York City Dep't of Educ., No. 12-CV-4493, 2013 WL 5312537, at *9 (S.D.N.Y. Sept. 23, 2013) ("[T]he fact that Plaintiff signed the enrollment contract with Cooke before having attended the CSE does not demonstrate that she had already made up her mind to reject any recommended public placement."), and her concerns were understandable: just one year prior, an IHO found that the DOE had failed to provide H.B. with an offer of a FAPE and that Aaron was an appropriate placement for him. See Ex. C at 5-17. C.D. also testified credibly that she was keeping options open by sending the ten-day notice while simultaneously seeking information about the placement offer. Tr. 391-92. This court finds that these simultaneous actions reflected the double bind the parents faced as a result of the defendant's unresponsiveness to their diligent requests, rather than evidence of insincerity or duplicity on their part.

Defendant has provided no reason to withhold deference from the IHO's determination that the equities favor the parents in this case, and this court is fully justified in deferring to it.

## CONCLUSION

For the reasons stated above, plaintiffs' motion for summary judgment on the IDEA claim is granted and defendant's cross-motion on that claim is denied.

The complaint in this action also alleges violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Article 89 of the New York State Education Law. See Compl., Dkt. #1, ¶¶ 154-158. Neither party addressed these claims in their briefing on the cross-motions for summary judgment. Accordingly, the parties are directed to confer and submit a letter to the

court no later than June 27, 2016. This letter must advise the court whether plaintiff agrees to voluntarily dismiss these claims and, if not, propose a briefing schedule with respect to them.

Plaintiffs are directed to submit their application for attorney's fees pursuant to 20 U.S.C. § 1415(i)(3) to the Honorable James Orenstein, United States Magistrate Judge, to whom this court respectfully refers that application for report and recommendation. See 28 U.S.C. § 636(b).

SO ORDERED.

/s/(ARR)

_____

Allyne R. Ross
United States District Judge

Dated:      June 16, 2016
            Brooklyn, New York